IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Irene M. Watson,<br><br>    Plaintiff,<br><br>v.<br><br>Michael J. Astrue,[1]<br>Commissioner of Social Security,<br><br>    Defendant. | NO. CV06-113-TUC-FRZ (JM)<br><br>REPORT AND RECOMMENDATION |

Pursuant to 42 U.S.C. § 405(g), Plaintiff Irene M. Watson ("Watson") seeks judicial review of a final decision by the Commissioner of Social Security ("Commissioner") denying her benefits. This Social Security Appeal has been referred to the United States Magistrate Judge pursuant to Local Rule – Civil 72.2(a)(10) of the Rules of Practice of this Court. Based on the pleadings of the parties and the record submitted to the Court, the Magistrate Judge recommends that the District Court, after its independent review, grant in part Plaintiff's Motion for Summary Judgment [Doc. No. 15] and deny Defendant's Cross-Motion for Summary Judgment [Doc. No. 17].

**I. Procedural Background**

Watson applied for Disability Insurance Benefits on January 15, 2003, claiming disability with an onset date of January 4, 2002, due to mycobacterium avium intracellular

---

[1] Michael J. Astrue is substituted for his predecessor, Jo Anne B, Barnhart, as Commissioner of the Social Security Administration. 42 U.S.C. § 405(g); Fed.R.Civ.P. 25(d)(1).

("MAI"), arthritis, bronchiectasis, asthma, Hashimoto's thyroiditis, recurrent pneumonias, adrenal insufficiency, chronic rhinitis, recurrent esophagitis, and osteopenia. (Tr. 14, 83-85 & 110). The application was denied initially and upon reconsideration. (Tr. 66-69 & 71-75). Watson then requested a hearing before an ALJ. (Tr. 57-58). The hearing was held on May 18, 2004, in San Jose, California, and her claims were denied by the ALJ in a decision dated July 30, 2004. (Tr. 13-21). Watson requested review of the hearing decision by the Appeals Council. (Tr. 9). The decision became the final decision of the Commissioner when the Appeals Council did not grant Watson's request for review. (Tr. 5-7). On August 3, 2005, Watson commenced this action pursuant to 42 U.S.C. § 405(g) seeking judicial review of the ALJ's decision.

**II.     Record on Appeal**

       **A.     Watson's Testimony**

Watson was born on November 7, 1941. (Tr. 372). Until January 2002, she was a self-employed consultant doing computer engineering. (Tr. 372). Her work involved the analysis of engineering issues and computer software engineering. (Tr. 372). She usually worked at a computer while in a sitting position. (Tr. 372-73).

At the time she stopped working, she was experiencing a pinched nerve in her neck which caused pain to radiate down her arm which increased when she was working at the computer. (Tr. 373). She was also experiencing fatigue and using stimulants "to try to raise the level of [her] thinking . . . ." (Tr. 373). However, the stimulants caused her to develop respiratory infections and caused pneumonia requiring hospitalization shortly after she stopped working. (Tr. 374). She also has asthma. (Tr. 374). During work she was experiencing fatigue, coughing, and pain symptoms. (Tr. 375). It was necessary for her to take a break every few minutes or so, and sometimes she would need to take a nap. (Tr. 376-77).

Her treating physician was Dr. Andrew Newman, a pulmonologist. (Tr. 377). She sees Dr. Newman every four to six weeks. (Tr. 378). Watson indicates that Dr. Newman

explained that her pneumonia was scarring her lungs and was reducing her oxygen intake. (Tr. 377). She explains her symptoms as morning mucous that causes coughing episodes and sometimes has asthma attacks with "very intense coughing and gasping for breath." (Tr. 379).

Watson also sees Lynn Gorodski, Ph.D., for her depression. (Tr. 383). She explains that she used to be "a high energy person," but is distressed about having an illness for which there is no cure. (Tr. 383).

Watson walks to the grocery store which is about five blocks from her home. (Tr. 381). Lifting or carrying a package of any appreciable size causes pain in her right arm and leg. (Tr. 387). She can use a knife and fork with her right hand, but her neck and right arm are bothered by the use of a keyboard or computer. (Tr. 387).

### B.      Medical Expert Testimony

Dr. Franks, who is board certified in internal medicine, testified at the hearing. Under questioning from Watson's attorney, Dr. Franks stated that he was not a pulmonologist, but that he "had a great deal of experience in the diagnosis and treatment of lung diseases." (Tr. 389). Upon questioning by the ALJ, Dr. Franks provided a summary of Watson's medical history. (Tr. 389-393). Based on his review of her medical records, Dr. Franks opined that Watson would be limited to performing sedentary type work. (Tr. 393).

In follow-up questioning, Watson's counsel asked Dr. Frank if he had reviewed a six page coronary impairment medical source statement prepared by Dr. Newman. (Tr. 394-395). Dr. Franks indicated that he did not have a copy of the statement and counsel therefore requested a supplemental hearing to allow Dr. Franks to review it. The ALJ did not rule on the request, but repeatedly asked counsel if he had any questions for the doctor. Watson's counsel then inquired about Dr. Franks opinion that Watson was able to do sedentary work and specifically asked if he believed she was capable of doing sedentary work "eight hours a day, five days a week, 52 weeks a year." Dr. Franks responded, "Look, she's very borderline and there may be more information that I should have available before arriving

at the at definitely, but from what I have here, yes, I do think she is capable of doing that." (Tr. 397). Counsel then asked if this was his opinion to a medical certainty and the doctor stated, "Look, don't ask me for medical certainty. I am in no position to express medical certainty under these circumstances," and then stated, "As best that I can tell, she's capable of doing sedentary work." (Tr. 397). After being prevented from asking Dr. Frank about his income from testifying as a medical advisor, Watson's counsel established that Dr. Franks had not reviewed any reports from Watson's psychologist and that he did not therefore consider those conditions in reaching his opinion. (Tr. 400-401).

### C. Vocational Expert Testimony

Upon questioning by the ALJ, the VE was able to characterize the nature of Watson's past work as skilled and sedentary. (Tr. 402). However, the VE did not offer an opinion on whether Watson's previous work required repetitive use of her right arm in either fingering keys or other occasional tasks; rather he left that decision to the ALJ. (Tr. 402-403). The VE did not believe that her skills were transferrable to any jobs that would involve any less fingering, handling or reaching. (Tr. 403).

Upon questioning by Watson's counsel, the VE indicated that Ms. Watson would be unable to perform her past relevant work if she was found to have a marked limitation in maintaining concentration, persistence or pace. (Tr. 403). The VE also believed that a marked limitation in her social functioning would "substantially erode her employment." (Tr. 404). Finally, the VE was asked to assume that Watson's testimony regarding her level of fatigue was true, and what the impact would be on her ability to perform full-time work. The VE indicated that based on Watson's testimony, there would be no jobs she could perform. (Tr. 404).

### D. Medical Records

#### 1. Physical Health Records

On March 3, 2002, Watson presented at the Stanford Hospital complaining of breathing difficulties. (Tr. 198). Upper respiratory infection and bronchitis were the listed

4

impression. (Tr. 200). X-rays disclosed "multiple bilateral, diffused subcentimeter parenchymal opacities." Diagnosis possibilities included atypical infection or metastatic fossae, and the radiologist recommended comparison with old films, if available. (Tr. 197).

Two days later, on March 5, 2002, Watson was admitted to the Stanford Hospital with an admission diagnosis of cough, fever and chills. (Tr. 185). Watson was complaining of chest pain and "abnormal labs" were noted. (Tr. 193). Chest x-rays showed "multiple 1-2 cm pulmonary nodules scattered throughout the lung parenchyma bilaterally," including several that were new since the prior examination. (Tr. 191). There was also a "patch bilateral pattern of alveolar opacification" that had appeared to have progressed from the prior examination. The impression was that the nodules were likely infectious in nature, given Watson's history of MAI and aspergillosis. (*Id.*). She was discharged on March 11, 2002, with a diagnosis of pneumonia, history of MAI, history of Hashimoto's thyroiditis, adrenal insufficiency secondary to chronic prednisone use, reactive airway disease, degenerative joint disease, and acute bronchopulmonary aspergillosis. (Tr. 185). On discharge, her medications included Lavaquin, Flovent, Advair, Nasacort, Synthroid, Progesterone cream, Climara patch, Ambien, and Ativan, and she was directed to follow-up with her treating physician, Andrew Newman, M.D., a pulmonologist. (Tr. 186-87).

A chest x-ray from March 22, 2002, showed "interval improvement in the bilateral pulmonary nodules and alveolar opacities with faint areas of persistent, primarily in the upper lobes. The findings are most suggestive of resolving infectious process." (Tr. 182).

In April and May, Watson saw Dr. Newman regularly for follow-up and he noted that she was "generally doing quite well," and noted that she was to follow-up "after her upcoming trip to France." (Tr. 266).

On May 5, 2002, Watson was admitted to the Stanford Hospital with a diagnosis of cough, fever and chills. (Tr. 185). While in the hospital, she was found to have "multiple bilateral sub centimeter atypical infiltrates consistent with infection." She was given antibiotics and vicodin for reported chest pain. Her symptom gradually improved and at

discharge she was "waling around the hospital wards without difficulty or shortness or breath." Her oxygen saturation was consistently normal during her admission. (Tr. 185-86). During her stay, she was also found to have a slightly elevated rheumatoid factor. Dr. Newman noted her history of Hashimoto's thyroiditis and stated that she might have an "underlying rheumotologic disorder." (Tr. 186). Her discharge diagnoses, on May 11, 2002, included pneumonia, history of MAI, history of Hashimoto's thyroiditis, adrenal insufficiency, reactive airway disease, degenerative joint disease and acute broncholpulmonary aspergillosis. (Tr. 185).

On May 7, 2002, during her hospitalization, Watson was referred by Dr. Newman to see R. Elaine Lambert, M.D., a rheumatologist. (Tr. 180-81). Dr. Lambert reviewed her treatment of her MAI from her hospitalization and found that she had an "excellent response to [the] triple combination of antibiotics, of Zosyn, Levaquin, and Zithromax." She noted the underlying Hashimoto's and asthma, but found Watson looked "quite well." (Tr. 180). Her lung examination was described as "remarkably clear." (*Id*.). Dr. Lambert's impression was that Watson's "dramatically elevated sedimentation rate was indeed due to her MAI pneumonitis and is fortunately improving with her clinical response." (*Id*.).

In late May and early June 2002, Watson was seen for knee pain and an MRI disclosed chronic ACL tear with medial compartment arthritis. (Tr. 169-79). The plan was to try to rehabilitate the legs in physical therapy. (*Id*.). Also in June 2002, Dr. Newman saw Watson for leg edema that he attributed to a "probable drug reactions." (Tr. 262-263).

In July 2002, Watson was seen a number of times at the Stanford Hospital and Clinics. On July 3, she was seen in relation to leg swelling and doppler imaging revealed no evidence of deep venous thrombosis. (Tr. 167). On July 5, she underwent a CT scan of the chest, abdomen and pelvis. (Tr. 161-165). "Multiple clustered, ill-defined nodular and ground-glass opacities" were found involving the lungs bilaterally and were described as worsened in the upper lobes and improved in the lower lobes when compared to a prior study. (*Id*.). These findings were described as "non-specific" but "at least compatible with MAI

6

infection." (*Id.*). Also found were "very mild cylindrical bronchiectasis," "incidental renal cysts," and "very heterogeneous uterine myometrium, most consistent with a fibroid uterus." (*Id.*). On July 11, a stress echocardiography report was performed based on complaints of chest pain. (Tr. 159). The report reflects that Watson experienced dyspnea during exercise and that the exercise was stopped due to fatigue. (*Id.*).

On August 28, 2002, Watson was seen by Loretta Chou, M.D., for a right elbow strain. (Tr. 156). Dr. Chou noted mild joint-space narrowing and mild degenerative joint disease, with no evidence of fracture. (Tr. 156). The doctor's impression was that Watson was experiencing "[r]ight elbow olecranon bursitis." (Tr. 157). Her treatment plan was to use an ACE bandage along with elevation, ice and gentle stretching exercises. (Tr. 157).

A November 4, 2002, visit to Dr. Newman reported past medial history of MAI, Hashimoto's thyroiditis, adrenal gland, reactive airway disease, degenerative joint disease, and a history of secondary adrenal insufficiency following prednisone use. (Tr. 148). The doctor found suppressed TSH and that Watson had lost 9 pounds since her last visit. (Tr. 148).

From December 2002 through February 2003, Watson underwent a course of physical therapy at the Orthopedic Sports & Spine Rehabilitation Center in Palo Alto, California. (Tr. 204-214). The goals of treatment were described as pain relief, increased range of motion, increased strength, improved posture/body mechanics, decreased neurological signs and exercise instruction. (Tr. 208). At the completion of the treatment course, Watson was described as having made "significant progress" in each of these areas. (Tr. 204).

On January 3, 2003, Watson was seen by Dr. Newman, M.D., who indicated a suppressed thyroid-stimulating hormone ("TSH") and recommended reduction of Watson's synthroid dose. The doctor noted that Watson was concerned that her energy level would be poor on a lower dosage. (Tr. 146). Dr. Newman also noted that her osteopenia was stable on a Climara patch and progesterone cream and that her adrenal insufficiency "appears to have resolved." (*Id.*). A bone density summary report from the same day found Watson's

AP spine and left hip to be osteopenic. (Tr. 147).

On January 6, 2003, Watson was seen by Mark Genovese, M.D., in relation to a history of neck, shoulder and right elbow pain that was previously evaluated in December 2002. (Tr. 152). Dr. Genovese's assessment was that "there does not appear to be any significant evidence to support an inflammatory cause for her discomfort." He thought it was more likely that the neck and shoulder pain resulted from a mechanical process and recommended compression, stretching exercises, and the avoidance of strenuous activity with the right arm. (Tr. 154).

On January 21, 2004, Watson was seen by Rosa Dell'Oca, M.D., regarding several masses in her hands. (Tr. 302). The doctor noted a nodule in the palm of her right hand and tightness in the sole of her foot. (*Id.*). She scheduled Watson for a return appointment in 6 months. (Tr. 303).

On March 8, 2004, Watson was again admitted to the hospital with an admission diagnosis of "possible pneumonia." (Tr. 325). After treatment with Avelox, nebulizers and Singulair, she was released on March 9, 2004, with a discharge diagnosis that included possible pneumonia, bronchiectasis, history of chronic MAI, Hashimoto's thyroiditis, and osteopenia. (Tr. 325-326). She was instructed to follow-up with Dr. Newman within one week. (Tr. 327).

### 2. Physical Therapy Records

Beginning in December 1999, Watson received physical therapy from the Orthopedic Sports & Spine Rehabilitation Center in Palo Alto, California. The initial diagnosis/impression was cervical pain, a disc protrusion at the C5-C6 level, and right knee pain. (Tr. 226). It was noted that Watson's pain symptoms increased when she was working on the computer. (*Id.*). Watson's goals were described and "pain management and relief," and her pain level was described as a 4 on a scale of 1 to 10. (Tr. 225).

By January 2000, significant progress was reported in relation to pain relief, range of motion, strength, body mechanics, neurological signs and exercise instruction. (Tr. 222).

Subjective reports included decreased pain, to 2 or 3 out of 10, but also reflected that Watson was working 20 hours per week and that her symptoms would increase after working about 3 hours. (*Id.*). It was also noted that she would benefit from continued therapy. (*Id.*).

In March and April 2000, Watson was noted to be making significant progress. (Tr. 215). Her pain ratings for her neck were reported at 3 and 4. (Tr. 215-216). In April, the therapist noted that she had "improved in all areas and is ready to attempt an independent home program." (Tr. 215). Treatment notes show that Watson continued with the therapy though April 4, 2000, and attended a total of 26 appointments. (Tr. 229).

The records then reflect a gap in treatment until December 2002, when Watson presented for an additional seven appointments seeking reduction of neck and knee pain, which she rated as a 6 of 10, and increased range of motion. (Tr. 208-213 & 228). During this course, significant progress was reported, but Watson continued to report pain levels in her neck, shoulder and arm ranging from 3 to 6. (Tr. 206). By February 24, 2003, progress was again indicated, but the pain levels remained in essentially the same range. (Tr. 204). Watson also continued to report an increase in symptoms when working on the computer. (*Id.*). Watson had 14 therapy sessions during this course of treatment. (Tr. 227-228).

### 3. Psychiatric Records

On April 28, 2003, Pearl Peskin, M.D., completed a Psychiatric Review Technique. (Tr. 239). Dr. Peskin found no medically determinable psychiatric impairment, but noted that "Coexisting Nonmental Impairment(s) that Requires Referral to Another Medical Specialty." (*Id.*).

On August 25, 2003, Lynn Gorodsky, M.D., Watson's treating psychiatrist, competed another Psychiatric Review Technique. (Tr. 283). Dr. Gorodsky's assessment was that Watson suffered from "affective disorders," and a "depressive syndrome" characterized by loss of interest in activities, appetite and sleep disturbance, psychomotor agitation, decreased energy, feelings of worthlessness, difficulty concentrating and thoughts of suicide. (Tr. 290). Also reported were marked limitations of activities of daily living, social functioning, and

concentration, persistence and pace, with one or two episodes of decompensation. (Tr. 291). Accompanying the assessment was a letter from Dr. Gorodsky opining that Watson was not able to work due to stress induced by work and her failing health. (Tr. 292-293).

On March 26, 2004, Dr. Gorodsky reported that Watson's physical health continued to deteriorate and that she was experiencing "mounting anxiety with regard to her capacity to support herself and her son and this continues to lead to depression." (Tr. 323). She believed that Watson's capacity to work was "severely impaired." (*Id*.).

### 4.  RFC Assessment

A Physical Residual Functional Capacity Assessment was competed on April 25, 2003, and reflects that Watson could occasionally lift 20 pounds, frequently lift 10 pounds, could stand and sit for 6 hours, and push or pull without limits. (Tr. 241). Watson was also evaluated as being able to climb, balance, stoop, kneel, crouch, and crawl "frequently." (Tr. 242). No visual, manipulative, communicative or environmental limitations were found. (Tr. 243-244). The evaluating physician concluded that Watson's symptoms were attributable to a medically determinable impairment. (Tr. 245).

## III.  ALJ's Decision

In the decision dated July 30, 2004, the ALJ found that the record established that Watson's "degenerative joint disease with arthritis in the knees, Hashimoto's thyroiditis, a history of MAI (mycobacterium avium infection) pneumonitis, asthma, chronic obstructive airway disease, and reflux disease with recurrent esophagitis, are considered 'severe' based on the requirement in the Regulations 20 C.F.R. § 404.1520(c)." However, she found that these medically determinable impairments "do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4." (Tr. 20).

The ALJ next found that Watson was not totally credible because her allegations regarding her limitations "exceed what could reasonably be expected based on the medical evidence of record." (Tr. 21).

The ALJ then concluded that Watson had the residual functional capacity to perform

sedentary work and that her past relevant work as a software engineer "did not require the performance of work-related activities precluded by her residual functional capacity." (Tr. 21). Thus, Watson was found able to perform her past relevant work and, therefore, was not under a disability as defined in the Social Security Act. (Tr. 21).

**IV.     Legal Standards**

A district court's review of a disability determination is limited, and a final administrative decision can be revised "only if it is based on legal error or if the fact findings are not supported by substantial evidence." *Sprague v. Bowen*, 812 F.2d 1226, 1229 (9th Cir. 1987). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Morgan v. Commissioner of the Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999); *Vertigan v. Halter*, 260 F.3d 1044, 1049 (9th Cir. 2001). It consists of "more than a mere scintilla but less than a preponderance." *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999); *Young v. Sullivan*, 911 F.2d 181, 183 (9th Cir. 1990).

"In determining whether the Commissioner's findings are supported by substantial evidence, [the Magistrate Judge] must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998); *see also Aukland v. Massanari*, 257 F.2d 1033, 1035 (9th Cir. 2001). However, the ALJ's decision must be upheld if the evidence is reasonably susceptible to more than one rational interpretation, *Allen v. Secretary of Health and Human Services*, 726 F.2d 1470, 1473 (9th Cir. 1984), and the court cannot substitute its judgment for that of the Commissioner. *Reddick*, 157 F.3d at 720-21.

The claimant is "disabled" for the purpose of receiving benefits under the Act if she is unable to engage in any substantial gainful activity due to an impairment which has lasted, or is expected to last, for a continuous period of at least twelve months. 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505(a). "The claimant bears the burden of establishing a prima facie case of disability." *Roberts v. Shalala*, 66 F.3d 179, 182 (9th Cir. 1995), *cert.*

11

*denied*, 517 U.S. 1122 (1996); *Smolen v. Chater*, 80 F.3d 1273, 1289 (9th Cir. 1996).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process to be followed by the ALJ in a disability case. *See* 20 C.F.R. § 404.1520. At step one of the process, the ALJ must determine whether the claimant is currently engaged in substantial gainful activity; if so, a finding of non-disability is made and the claim is denied. 20 C.F.R. § 404.1520(b). When the claimant is not currently engaged in substantial gainful activity, the ALJ, in step two, must determine whether the claimant has a severe impairment or combination of impairments significantly limiting her from performing basic work activities; if not, a finding of non-disability is made and the claim is denied. 20 C.F.R. § 404.1520(c). A severe impairment or combination of impairments exists when there is more than a minimal effect on an individual's ability to do basic work activities. 20 C.F.R. § 404.1521(a); *Smolen*, 80 F.3d at 1290. Basic work activities are "the abilities and aptitudes necessary to do most jobs," including physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling, as well as the capacity for seeing, hearing and speaking, understanding, remembering and carrying out simple instructions, use of judgment, responding appropriately to supervision, co-workers and usual work situations, and dealing with changes in a routine work setting. 20 C.F.R. § 404.1521(b).

At the third step, the ALJ must compare the claimant's impairment to those in the Listing of Impairments, 20 C.F.R. § 404, Subpart P, App. 1; if the impairment meets or equals an impairment in the Listing, disability is conclusively presumed and benefits awarded. 20 C.F.R. § 404.1520(d). When the claimant's impairment does not meet or equal an impairment in the Listing, in the fourth step, the ALJ must determine whether the claimant has sufficient "residual functional capacity" despite the impairment or various limitations to perform his past work; if so, a finding of non-disability is made and the claim is denied. 20 C.F.R. § 404.1520(e). When the claimant shows an inability to perform past relevant work, a prima facie case of disability is established and, in step five, "the burden shifts to the Commissioner to show that the claimant can perform some other work that exists in

'significant numbers' in the national economy, taking into consideration the claimant's residual functional capacity, age, education, and work experience." 20 C.F.R. § 404.1520(f).

In this case, the ALJ's determination of non-disability was made at step four of the inquiry process, finding Watson retained the residual functional capacity to perform her past relevant work.

**IV. Discussion**

**A.   Did the ALJ improperly disregard the opinions of Watson's treating physician?**

Watson's initial argument is that the ALJ improperly disregarded the opinion of her treating physician, Dr. Newman. In evaluating the opinions of treating physicians, the opinions should be given great deference, but they are "not necessarily conclusive as to either the [claimant's] physical condition or the ultimate issue of disability." *Morgan v. Commissioner of Social Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999). While not bound by the opinions of the claimant's treating physicians on the ultimate issue of disability, the ALJ cannot reject the uncontroverted opinion of a claimant's treating physician on the ultimate issue of disability "'without presenting clear and convincing reasons for doing so.'" *Reddick*, 157 F.3d at 725 (quoting *Matthews v. Shalala*, 10 F.3d 678, 680 (9th Cir. 1993)). However, when the opinion of another doctor contradicts the treating physician's opinion, "the Secretary can disregard the latter only by setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record." *Ramirez v. Shalala*, 8 F.3d 1449, 1453 (9th Cir. 1993) (quoting *Baxter v. Sullivan*, 923 F.2d 1391, 1396 (9th Cir. 1991)) (internal quotations omitted). In making this determination, it is the Court's duty to "review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Reddick*, 157 F.3d at 720; *see also Aukland v. Massanari*, 257 F.3d 1033, 1035 (9th Cir. 2001). Here, the Magistrate Judge finds that under either standard of review, the ALJ's determination cannot be upheld.

As a threshold matter, there is no dispute that the ALJ appropriately accorded great

13

weight to the opinions of Dr. Newman, as Watson's treating physician. (Tr. 19) ("The undersigned accords considerable, but not controlling weight, to Dr. Newman's opinion."). When rejecting such opinions, an ALJ can satisfy the burden of providing specific and legitimate reasons "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Magallanes v. Bowen,* 881 F.2d 747, 751 (9th Cir.1989) (quoting *Cotton v. Bowen,* 799 F.2d 1403, 1408 (9th Cir.1986) (internal quotation marks omitted)). Although the ALJ detailed and summarized Dr. Newman's findings, his interpretation of those findings, and his rejection of Dr. Newman's opinions, is not supported by legitimate reasons.

Dr. Newman believed that Watson "could not work at all." (Tr. 331). In support of this opinion, he provided the following specifics:

> The bronchiectasis and MAI and aspergillus and recurrent bacterial exacerbations make her feverish, fatigued and with serious weakness and malaise and inability to concentrate. She was recently hospitalized for this at Stanford.
>
> The presence of mucus in her airways is a constant trigger for her asthma which frequently flairs necessitating much more inhaler or inhaled steroid use and difficulty with shortness of breath and wheezing.
>
> The combination of Adrenal Insufficiency and Hashimoto's thyroiditis gives her an overall underlying level of weakness and discomfort. Her adrenal glands will never return to normal because of her previous steroid use and because of her other immunological problems and the presence of chronic untreatable infection.
>
> Her Reflux esophigitis causes chest pain and also results in acid going into her chest which worsens her bronchiectasis and cause worse airway spasm.
>
> The chronicity of her infections and bronchiectatic problems have resulted in both restrictive and obstructive lung disease on top of her asthma which will worsen with time and for which there is no cure (there is not even a good palliative therapy).
>
> Her degenerative diseases in her spine results in frequent chest pain as well.

(Tr. 332-333).

The ALJ rejected Dr. Newman's opinion by relying on the testimony of the testifying medical expert, Dr. Franks. However, the ALJ ignored Dr. Franks' testimony that he had not reviewed Dr. Newman's six-page statement describing Watson's treatment history, diagnoses and prognosis. (Tr. 328-333). When Watson's counsel discovered that Dr. Franks had not reviewed the statement from Dr. Newman, he requested a supplemental hearing to ensure that Dr. Franks had reviewed all the relevant medical information and had that information at his disposal for reference during questioning. (Tr. 395). The ALJ responded to counsel's request by stating that "You may want whatever you want. I can't do anything about it, it's not a perfect world." (Tr. 395). The ALJ's animus toward counsel was further established when, after counsel indicated he would not waive the right to a supplemental hearing, the ALJ responded "You haven't waived a thing . . . your entire life." (Tr. 396). After this exchange, Dr. Franks testified that Watson was "very borderline and there may be more information that I should have available before arriving [at the opinion that she capable of engaging in sedentary work on a full-time basis]." (Tr. 396-397).

There are several problems raised in relation to Dr. Franks opinion. It is the ALJ's obligation to fully and fairly develop the record even when the claimant is represented by counsel. *Celaya v. Halter*, 332 F.3d 1177, 1183 (9th Cir. 2003). This duty is particularly important where "the record is inadequate to allow for proper evaluation of the evidence." *Mayes v. Massanari*, 276 F.3d 453, 459, 460 (9th Cir. 2001); *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001). In adopting Dr. Franks opinion, the ALJ failed to satisfy her obligation to first develop the record. Dr. Franks did not have access to the complete opinion of Watson's treating physician, Dr. Newman. When he learned that he did not have some of the information from Watson's file, Dr. Franks quite reasonably qualified his opinion. Given the qualified nature of the opinion, it does not constitute the "clear and convincing" evidence or "specific and legitimate reasons" for rejecting Dr. Newman's opinion.

. . . .

. . . .

**B.     Did the ALJ error improperly conclude that Watson's mental impairment was non-severe?**

Watson did not submit any progress or treatment notes related to her psychiatric care. The ALJ accorded no weight to Dr. Gorodsky's opinion because it was "not supported by any longitudinal record of treatment." (Tr. 19). This is a legitimate basis for rejecting this portion of Watson's claim. A denial of benefits may be set aside only if it is not supported by substantial evidence or it is based on legal error. *Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999). "Substantial evidence is relevant evidence which, considering the record as a whole, a reasonable person might accept as adequate to support a conclusion." *Flaten v. Secy of Health & Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995). Here, the ALJ's opinion with regard to Watson psychiatric condition cannot be set aside because a reasonable person, given the dearth of supporting evidence, need not have accepted the opinions of Dr. Gorodsky because they were at least arguably conclusory, and were certainly inadequately supported by clinical findings. *See Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir.2002).

**C.     Did the ALJ err by finding that Watson could return to her past relevant work?**

Watson's next assertion is that the ALJ erroneously concluded that she could return to her past work as an computer engineering consultant despite a finding that she was limited in repetitive use of her right arm. Specifically, Watson contends that the ALJ failed to fully compare her residual functional capacity with the demands of her past relevant work. The Court agrees.

Pursuant to SSR 96-8p, once the ALJ makes a finding as to the claimant's RFC, it must me determined whether the claimant

> can still do past relevant work as he or she *actually* performed it because individual jobs within an occupational category as performed for particular employers may not entail all of the requirements of the exertional level indicated for that category in the *Dictionary of Occupational Titles* and its related volumes.

SSR 96-8p. In her decision, the ALJ stated that "the impartial vocational expert testified that based upon the clamant's residual functional capacity, the claimant could return to her past

16

relevant work as [a] computer software engineer as previously performed and as generally performed in the national economy." (Tr. 20). However, the testimony of the VE on this point was not as clear as described.

As a preliminary matter, the Secretary contends that the ALJ did not expressly accept Dr. Franks' opinion that Plaintiff was limited in her ability to engage in repetitive use of her right arm. That is true, but considering that she relied on Dr. Franks' opinion in other regards and certainly did not expressly reject his opinion about the limitations in the use of her right arm, it is reasonable to assume that the ALJ did adopt that opinion. This interpretation of the record is certainly bolstered by the fact that the ALJ questioned the VE regarding whether Watson's previous work required the repetitive use of her right arm. (Tr. 402).

Returning to the question of whether the ALJ satisfied SSR 96-8p, it is clear from the record that the VE, upon questioning by the ALJ, was equivocal as to whether Watson's past work required the repetitive use of her right arm:

> Well, Your Honor, it does require frequent fingering, so when operating computer keyboard clearly requires frequent fingering. Actual handling and reaching are only occasional, so whether, Your Honor, you feel that frequent fingering and occasional handling and reaching equate to the doctor's indication of no repetitive use of the right arm, that would be the main factor there. To get clearly the position as you perform the sedentary, there was frequent fingering used there was occasional handling, and whether no repetitive use of the right arm would meet that standard, Your Honor, I defer to your [INAUDIBLE].

(Tr. 402-403). This testimony cannot reasonably be characterized as an opinion that Watson could return to her past relevant work as a computer software engineer "as previously performed and as generally performed in the national economy." In fact, the VE expressly, albeit inappropriately, left that determination to the ALJ. The VE should have been questioned regarding the requirements of Watson's previous work and the ALJ should have explored the nature of that work as it was performed by Watson and as it is typically performed in the national economy. As the record exists, there is no sufficient basis for the ALJ determination that Watson was capable of performing her past work.

17

**D.     Did the ALJ improperly conclude that Watson was not credible?**

Watson's final assertion is that the ALJ erroneously determined that she was "not totally credible." (Tr. 21). To support such a finding, the ALJ must provide clear and convincing reasons for rejecting the claimant's excess pain or symptom testimony, such as conflicts between the claimant's testimony and conduct, or internal contradictions in the claimant's testimony. *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir 1993); *Light v. Social Security Admin.*, 119 F.3d 789, 792 (9th Cir. 1997). In determining whether a claimant's testimony regarding the severity of symptoms is credible, the ALJ may consider: "(1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities." *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996).

Here, the Secretary contends that the ALJ cited the required evidence. First, the ALJ noted that Watson traveled to France shortly after her March 2002 hospitalization for pneumonia, that she stabilized and her condition resolved in one day after her March 2004 hospitalization, and that there was no evidence that her progressive lung disease caused a marked loss in her pulmonary functioning. In light of the consistency of Watson's testimony with that of her treating physicians, the Court does not find these reasons to be clear and convincing. The ALJ never inquired of Watson about her planned travel to France. In fact, the Court has not found evidence that the trip actually took place. The only mention of it in the record is in a note by Dr. Newman. (Tr. 266). Watson was not questioned regarding the nature of the trip or the reasons. The Secretary additionally asserts that Watson's activities of daily living support the adverse credibility determination. However, insofar as the Court can discern, when questioned about her activities, Watson described them as limited and belabored. Without a more complete exploration of the nature of Watson's activities, the evidence supporting an adverse credibility determination is not clear and the reliance on that

evidence is unconvincing.

**V.     Recommendation**

The Magistrate Judge recommends that the District Court, after its independent review of the record, enter an Order **granting in part** Plaintiff's Motion for Summary Judgment [Doc. No. 15], **denying** Defendant's Cross-Motion for Summary Judgment [Doc. No. 17] and **remanding** this matter pursuant to sentence four of 42 U.S.C. § 405(g) for further consideration consistent with this report and recommendation.  It is further recommended that the matter be assigned to a new ALJ.

This Recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals.  Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the District Court's judgment.

However, the parties shall have ten (10) days from the date of service of a copy of this recommendation within which to file specific written objections with the District Court.  *See* 28 U.S.C. § 636(b)(1) and Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure.  Thereafter, the parties have ten (10) days within which to file a response to the objections.  If any objections are filed, this action should be designated case number: **CV 06-0113-TUC-FRZ**.  Failure to timely file objections to any factual or legal determination of the Magistrate Judge may be considered a waiver of a party's right to *de novo* consideration of the issues.  *See United States v. Reyna-Tapia* 328 F.3d 1114, 1121 (9th Cir. 2003) (*en banc*).

DATED this 21st day of September, 2007.

Jacqueline Marshall
United States Magistrate Judge